FILED

02/04/2026

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 7, 2026 Session

**CARLOS GONZALEZ v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
No. 12-01055        Jennifer Johnson Mitchell, Judge
_____

**No. W2025-00894-CCA-R3-PC**
_____

The petitioner, Carlos Gonzalez, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received the effective assistance of counsel. After our review of the record, briefs, and applicable law, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. Ross Dyer, J., delivered the opinion of the court, in which Camille R. McMullen and Matthew J. Wilson, JJ., joined.

Lance R. Chism, Memphis, Tennessee, for the appellant, Carlos Gonzalez.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin L. Barker, Assistant Attorney General; Steve Mulroy, District Attorney General; and Carla Taylor, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

On direct appeal, this Court summarized the facts surrounding the petitioner's convictions for one count of second-degree murder, three counts of attempted second-degree murder, one count of misdemeanor reckless endangerment, three counts of aggravated assault, and three counts of employing a firearm during the commission of a dangerous felony, as follows:

Jesus Villa testified that on August 13, 2011, he went with his brothers, Miguel and Jose Villa, and friends to San Francisco, a club on Winchester Boulevard. When they exited their vehicle, "several people" approached them, shouting at them and insulting them. The strangers then began to assault the Villa group. They were "uttering" the words, "Playboy Surenos," the name of a Hispanic gang. Jesus Villa testified that he saw [the petitioner] shoot towards his group. [The petitioner] was in his car, and the gun was a black pistol. Jesus Villa identified [the petitioner] as the shooter both in the courtroom during his testimony and also in a photographic lineup soon after the shooting. Jesus Villa said that his brother Miguel was shot.

Jesus Villa further testified that he and his brothers were not in the Playboy Surenos gang. He said that another Hispanic gang was Los Pelones and that the Villa brothers were not in that gang either; however, he knew people in Los Pelones. Jesus Villa said that [the petitioner] was not involved in the "brawl" and that [the petitioner] was the only person with a firearm. He said one person in the attacking group had a bat and another had a metal pipe. There were more than twenty people in the attacking group.

Ricardo Ortega testified next. His recollection of events was substantially similar to that of Jesus Villa; however, Mr. Ortega said that he attempted to use pepper spray on the attacking group. In addition, he estimated that there were fifteen to twenty people in the attacking group. Mr. Ortega also identified [the petitioner] as the shooter in a photographic lineup soon after the shooting and again in court during his testimony. [The petitioner] was the only person who was shooting a gun, according to Mr. Ortega. On cross-examination, Mr. Ortega stated that the gunfire began about a minute after he sprayed the attacking group with pepper spray and that he had been in the process of backing away at that point. He originally thought two weapons were being fired. He affirmed that he was running away and looking back when he saw the shooter. He agreed that he used the nickname "Duende" in his statement to police rather than [the petitioner's] formal name.

Jose Villa testified consistently with the previous testimonies. He stated that he saw [the petitioner] shoot once and that he knew [the petitioner] fired the other shots. Jose Villa said that two people from the attacking group held him and beat him. He tried to defend himself. He said that he and his attackers had separated before the first shot was fired.

Shanika Brown testified that on August 13, 2011, she was driving down Winchester Boulevard when she heard gunshots. A bullet went through her windshield, and she immediately called 9-1-1. The dispatcher advised her to drive home, and the police met her at her house. Ms. Brown testified that she had glass particles in her mouth, hair, and legs but that she was not seriously injured. She stated that she was terrified by what happened.

Memphis Police Officer Alexander Robert Coughlin III testified that he was responding to a call at the Taco Bell in the Winchester/Ridgeway area when he heard gunshots at a shopping center across the street. He drove to the shopping center and saw a man lying on the ground. Officer Coughlin checked the man for a pulse, but the man was already deceased. Officer Coughlin testified that the people standing near the man appeared to be the man's family but that everyone else in the vicinity was "booking it" away from the scene. After other officers arrived to assist in preserving the scene, Officer Coughlin traced the victim's steps back to two trucks, approximately fifty to seventy-five yards away, and found "numerous shell casings." He testified that he had heard six gunshots.

Memphis Police Officer Justin Sheriff testified that he was a crime scene officer the night of the shooting in question and responded to the scene in that capacity. He discovered eleven 9mm shell casings at the scene.

Dr. Karen Chancellor, the Chief Medical Examiner for Shelby County, testified that she autopsied the victim. She said that a bullet entered the back of the victim on the right side, fractured a rib, then passed through his right lung, aortic arch, and left lung before exiting his chest.

Memphis Police Lieutenant Darren Goods testified that on August 14, 2011, the case coordinator for the shooting in question sent him and other officers to the Super 8 Motel on Lamar Avenue after receiving information that the shooting suspect was at the motel. The motel's manager informed the officers of the location of the room in which the suspect and several other people were staying, and the officers knocked on the door to that room. Lieutenant Goods testified that while the officers were outside of the room, they heard the "distinctive sound" of someone moving the top of the water tank on the room's toilet. After someone let them into the room, Lieutenant Goods went to the room's bathroom and saw that the top of the toilet's tank was pushed to the side and a white cloth was inside the tank. Lieutenant Goods testified that he obtained a search warrant and had a crime scene officer retrieve the cloth from the tank. They discovered a semi-automatic

handgun wrapped in the cloth. Lieutenant Goods said that one of the men in the room asked the police officers why they were there. Lieutenant Goods responded that they were there because of a shooting. Lieutenant Goods testified that [the petitioner], "without any provocation[,] . . . said something to the effect, '[Y]eah, I was there. As I pulled up, the shots rang out' or 'they started shooting.'"

Memphis Police Officer David Payment testified that he was responsible for collecting the firearm located at the Super 8 Motel. He said that the handgun, with a full magazine, had a total capacity of sixteen rounds.

Tennessee Bureau of Investigation Special Agent Laura Hodge testified that she examined a gunshot residue swab collected from the victim's hands. She said that she did not find any gunshot residue but qualified her response by explaining the fragility of gunshot residue and how easily it disappears.

Memphis Police Officer Lee Walker testified that he responded to Ms. Brown's location the night of the shooting to collect evidence from her car. He photographed her broken windshield and a bullet fragment located on the front passenger seat.

Tennessee Bureau of Investigation Special Agent Eric Warren testified that he examined a pistol and eleven spent 9mm cartridges collected by the Memphis police in this case and determined that all eleven cartridges had been fired by the pistol. He also examined a bullet fragment recovered in this case and determined that it also had been fired by the same pistol.

The State rested its case-in-chief, and [the petitioner] rested his case without presenting any proof. Following deliberations, the jury convicted [the petitioner] of second-degree murder (Count One), three counts of attempted second degree murder (Counts Two, Three, and Four), one count of misdemeanor reckless endangerment as a lesser-included offense of attempted second degree murder (Count Five), three counts of aggravated assault (Counts Six, Seven, and Eight), one count of assault as a lesser-included offense (Count Nine), and three counts of employing a firearm during the commission of a dangerous felony (Counts Ten, Eleven, and Twelve). He was acquitted of one count of employing a firearm during the commission of a dangerous felony. The trial court merged the aggravated assault convictions into the corresponding attempted second-degree murder

- 4 -

convictions and merged the assault conviction into the reckless endangerment conviction.

*State v. Gonzalez*, No. W2014-02198-CCA-R3-CD, 2015 WL 9171064, at *1-3 (Tenn. Crim. App. Dec. 15, 2015), *perm. app. denied* (Tenn. Apr. 7, 2016).

Following the denial of his direct appeal, the petitioner filed a timely pro se petition for post-conviction relief, arguing, in part, that trial counsel was ineffective for failing to discover or interview witnesses to support his defense, for depriving him of his right to testify, and for failing to raise a meritorious issue in his motion for new trial. Following the appointment of counsel, the petitioner filed an amended petition for post-conviction relief, arguing, in part, that trial counsel was ineffective for advising the petitioner not to testify at trial, for failing to adequately explain the pros and cons of testifying, for adopting the defense strategy that the petitioner was not the shooter, for failing to investigate the petitioner's case, for failing to allege in the motion for new trial that the trial court erred by not instructing the jury on the defense of others, for failing to "more strenuously" argue that a photograph of the victim should be admitted into evidence, for failing to introduce the photograph for identification following its exclusion, for failing to object to the State's improper rebuttal closing argument, and for failing to call Susana Hernandez as a witness during the jury-out hearing concerning the Facebook photograph. The petitioner also argued appellate counsel was ineffective for failing to include the amended motion for new trial and the photograph of the victim in the appellate record. An evidentiary hearing was held on May 18, 2023, during which trial counsel and appellate counsel testified.[1]

Trial counsel testified that he was appointed to represent the petitioner in March 2012. Although trial counsel did not recall the exact number of times he visited the petitioner at the jail, he agreed that the jail visitation log, which showed seven visits between August 2012 and July 2014, appeared accurate. Trial counsel testified that he and the petitioner also spoke during the petitioner's numerous court appearances. Trial counsel filed a motion for discovery and provided the petitioner with a copy of the discovery materials. Once trial counsel obtained the State's discovery, he noticed the witnesses' statements varied regarding the number of shooters, and trial counsel's investigator attempted to find witnesses who could be helpful to a defense theory of self-defense. However, the investigator was unable to locate anyone willing to provide a statement. Trial counsel believed "there was a reluctance . . . that they didn't want to help us or get involved."

---

[1] We limit our recitation of the testimony at the evidentiary hearing to that relevant to the petitioner's issues on appeal.

Initially, trial counsel did not ask the petitioner, "Did you do this?" However, trial counsel was aware that the petitioner alleged there was another shooter, which was why trial counsel attempted to locate witnesses to corroborate the petitioner's story. Because trial counsel was unable to obtain any proof to support a self-defense theory, he argued at trial that the petitioner did not participate in the shooting. Trial counsel questioned the State's witnesses as to what they saw and what the conditions were on the night of the shooting, arguing that the chaotic scene caused the witnesses to falsely accuse the petitioner. Trial counsel believed this was the "best strategy" given the evidence.

Trial counsel and the petitioner had "a few meetings" to discuss the advantages and disadvantages of the petitioner testifying. Trial counsel stated that "whenever possible [he] like[d his] client to testify." However, in this case, trial counsel had multiple reservations about the petitioner testifying. Because there was no proof, witnesses or otherwise, to corroborate the petitioner's testimony that there was another gun at the scene, once the petitioner testified, the jury "wouldn't have any doubt about who did the shooting." Additionally, during jail phone calls between the petitioner and his mother, the petitioner gave conflicting statements about whether he was involved in the shooting. Trial counsel told the petitioner that these calls would hurt his case due to the inconsistencies and because the petitioner put a gun in his own hand. Trial counsel could not recall whether he asked the petitioner why he made the inconsistent statements to his mother. Trial counsel was not worried about the petitioner's prior record because he did not "remember [the petitioner] having . . . a troublesome record," and because the State did not file a notice to impeach the petitioner using his record. Prior to the petitioner's *Momon*[2] hearing, trial counsel told the petitioner that he believed the petitioner should not testify. The petitioner indicated that he wanted to testify, and trial counsel told him that he was "going to have to convince [the jury] all by [himself] that basically [he] acted in self-defense." Trial counsel agreed that he may have raised his voice during the conversation but did not recall slamming his hand on the table. Trial counsel could not recall whether he told the petitioner that he needed to testify in order to receive a self-defense instruction, that he might be convicted of a lesser-included offense if he testified, that he could inform the jury of the victim's gang affiliation, or that he could tell the jury why he initially told his mother he did not participate in the shooting. However, trial counsel stated he informed the petitioner that his testimony could provide the jury with a more balanced view of the case and that he had no impeachable convictions. On cross-examination, trial counsel testified that he did not give the petitioner an opinion on whether he should testify until he heard the petitioner's jail phone calls.

---

[2] *Momon v. State*, 18 S.W.3d 152, 157 (Tenn. 1999).

During the trial, trial counsel attempted to introduce a photograph of the victim taken from Facebook. The photograph was of the victim and several other men and had been overlaid with the word "Pelones." Many of the men in the photograph, including the victim, were holding guns or swords. Trial counsel testified that he received the photograph from the petitioner's mother and that he wanted to introduce it at trial "[t]o show that the victim was in a gang and that there was more to this than meets the eye." During the jury-out hearing, the victim's brothers and a friend identified the victim in the photograph but denied that he was a member of the Pelones gang. They could not identify anyone else in the photograph or confirm any of its details. Trial counsel agreed that he told the trial court that he "assume[d] Your Honor's not going to let me introduce this photograph." Trial counsel testified that "it was clear the [trial court] wasn't going to let it in." After the trial court denied trial counsel's request to admit the photograph, trial counsel did not introduce it for identification, which trial counsel admitted "was a mistake on [his] part." "[He] planned on doing it . . . when [they] had that out-of-court hearing[, but he] must have just forgotten in the . . . heat of trial." Although trial counsel did not argue the photograph should be admitted to show the petitioner's state of mind, he stated that "by implication that's . . . why [he] was trying to put it in."

Regarding the State's closing argument, trial counsel testified that it was "clearly an error on [his] part" to not object to the prosecutor's comment regarding the victim being a "real person" who lived in Shelby County. Trial counsel did not find the prosecutor's statement calling the petitioner "a dealer of death" "nearly as objectionable" but testified that he also should have objected and asked for a mistrial after that comment.

Trial counsel asked the trial court to instruct the jury on the defense of others; however, the trial court denied his request finding the proof did not rise to the level of the defense of others. Trial counsel could not recall why he did not include this issue in the motion for new trial and stated, "[I]t was a mistake on my part."

Appellate counsel testified that he was retained to represent the petitioner during his direct appeal. After filing a notice of appeal, appellate counsel obtained a copy of the motion for new trial and the amended motion for new trial from the court jacket. One of the issues appellate counsel wanted to include in the direct appeal, the exclusion of the photograph of the victim, was not raised in the motion for new trial. The amended motion for new trial stated that the trial court erred "by precluding defense from questioning witnesses concerning their gang affiliation." However, during the motion for new trial hearing, the trial court discussed and analyzed the photograph in connection with the gang evidence issue, so appellate counsel believed it was sufficiently raised and includable in the petitioner's direct appeal.

Appellate counsel testified that he did not realize the amended motion for new trial was not in the appellate record until he received a copy of this Court's opinion. Appellate counsel had never had an issue with a motion for new trial or an amended motion for new trial not being included in the appellate record. He "never thought for a second that the [amended] motion for new trial would not make it up like it did." Additionally, appellate counsel was confused by this Court's reasoning in waiving the issue of the exclusion of the photograph of the victim because the argument was made during the motion for new trial hearing and the transcript of that hearing was included in the record. Appellate counsel filed a motion to reconsider with this Court, which was denied.

Regarding the photograph itself, appellate counsel could not recall whether the photograph was introduced for identification at trial or whether he included it in the appellate record.

During a second evidentiary hearing on July 20, 2023, the petitioner testified that trial counsel visited him in jail once or twice and spoke with him during his court appearances. The petitioner agreed that trial counsel gave him a copy of his discovery and reviewed the materials with him. Although trial counsel never asked the petitioner for his side of the story, the petitioner attempted to tell trial counsel what happened on the night of the shooting. However, when the petitioner told trial counsel that he fired his gun, trial counsel told the petitioner to "stick to the facts" and refused to let the petitioner explain why he shot his gun or how he felt on the night of the shooting. The petitioner believed that trial counsel did not want him to incriminate himself. The petitioner agreed that trial counsel attempted to locate witnesses who could help with his defense and provided the petitioner with a copy of the investigator's file, including "the line of questioning that he did with those people, the witnesses of the opposing party as well as the ones that were in the car with me and everyone else he could get in touch with." Although trial counsel did not disclose his trial strategy to the petitioner, he believed trial counsel would argue that the witnesses could not see the petitioner clearly due to the chaotic conditions.

Trial counsel asked the petitioner if he knew the victim was in a gang. The petitioner told trial counsel that he had seen the victim around but had never had any issues with him. The petitioner, a retired member of the Playboys Surenos, told trial counsel that he saw the victim "running with that crowd. Gang banging with that crowd," and that the victim was a member of the Pelones. The petitioner stated that he grew up with the victim's girlfriend, Gabriela Tostado, and that when their respective "crowds" would start "gang banging" the petitioner and the victim would "back up."

Trial counsel initially advised the petitioner that he had the right to testify and that he may or may not want to take the stand. However, trial counsel never told the petitioner any of the advantages or disadvantages of testifying. Trial counsel told the petitioner that

it was not a good idea for him to take the stand, specifically stating that the petitioner's prior record would come up if he chose to testify. A short time before the trial, trial counsel visited the petitioner, looking "extremely worried" and played his jail phone calls. When trial counsel played the call where the petitioner admitted to the shooting, trial counsel told the petitioner that "this blows our defense strategy out of the water." The petitioner testified that he initially told his mother that he did not participate in the shooting because he knew the call was being recorded and because he did not want to worry her. He could not recall whether trial counsel asked him why he lied to his mother during their first call. After the jail phone calls came out, trial counsel was "very adamant[]" that the petitioner not testify. The petitioner stated that he "really didn't think of [testifying] prior to the trial." However, following the State's proof, the petitioner told trial counsel that he "should go ahead and get on there [to] give [his] . . . version." Trial counsel's demeanor changed, and he told the petitioner that he would be "going out there on [his] own." Ultimately, the petitioner decided to trust trial counsel's advice not to testify. Before the petitioner's *Momon* hearing, the petitioner stated that trial counsel "coerced" him into giving the answers trial counsel wanted. The petitioner agreed that he testified at the *Momon* hearing that he and trial counsel went over the pros and cons of testifying, but the petitioner stated, "that's one of the things that he told me in the back."

If the petitioner had testified at trial, he would have told the jury that he drove three friends to a nightclub on the night of the shooting. One of his friends got out of the car to hold their place in line, and the others stated, "There go Chulito.[3] There them fools go right there." The petitioner's friends left the vehicle, and the petitioner looked in his rearview mirror and saw "a bunch of individuals . . . bunched up on something or somebody." The petitioner immediately turned his vehicle around and stepped outside. Seconds later, he heard a gunshot and saw a muzzle flash to his left. He heard it "again and again." He froze and felt "fear that gripped [his] body." Suddenly, the petitioner "had the gun out and the slide was locked back, and [his] finger was still . . . squeezing and [his] hand was shaking." The petitioner could not remember where he aimed or what direction he fired the gun because "everything happened within seconds." After firing the shots, the petitioner left the scene and drove to a friend's house. He overheard someone say, "He died." However, because so many guns were shot that night, the petitioner did not believe that he could have killed anyone. The petitioner later went to a motel with other gang members, where he was arrested the following day. The petitioner stated that he would have testified at trial if he had been advised to by trial counsel. On cross-examination, the petitioner agreed that he would have testified that he could not see who was shooting at him and that his shooting was reactionary. The petitioner stated that he was "not sure if [his testimony] would've went in line with self-defense or a crime of passion or in the spur of the moment." On redirect examination, the petitioner testified that he was unsure

---

[3] The petitioner testified that "Chulito" was the victim's nickname.

whether he fired in the direction of the muzzle flash. During further recross-examination, the petitioner agreed that he was in his vehicle during the initial fight and could have left the scene without involving himself. He also agreed that he did not check to see if anyone had been shot, render aid, or call the police following the shooting.

A third evidentiary hearing was held on July 27, 2023, during which trial counsel, Susana Hernandez, and Raquel Gonzalez testified. Trial counsel testified that the victim's mother brought him the photograph of the victim "either during trial or right before." She told trial counsel that she retrieved the photograph from someone's Facebook page and that the victim was in the photograph. Trial counsel testified that he did not call the person who downloaded the photograph from Facebook to testify at the jury-out hearing because he did not know who that person was. Trial counsel did not recall the petitioner's mother mentioning the name Susana Hernandez or Ms. Hernandez contacting his office. On cross-examination, trial counsel agreed that if he received the photograph during the week of trial, he would not have had time to investigate the source of the photograph. If given the photograph earlier, trial counsel would have provided it to his investigator, but he was unsure how helpful that would have been. Even if trial counsel knew the person who downloaded the photograph from Facebook, he did not believe the trial court would have allowed the photograph into evidence because "the person who took it down from Facebook can't say anything about the photograph." It was clear to trial counsel that the trial court's issue was with "the picture itself and the authentication of the picture itself, not where it came from or how or the fact that it came from Facebook." On redirect examination, trial counsel agreed that the trial court said that it did not "know where this picture came from." However, trial counsel did not interpret the trial court to mean that it did not know who downloaded the photograph from Facebook but that it did not know who took the photograph, where it was taken, who the other participants were, or who added the word "Pelones" to the photograph. Trial counsel pointed out that the State never argued that the photograph did not come from Facebook, so that was not an issue at the hearing. When asked if he might have met with the victim's mother a year before the trial, trial counsel stated that he was relying on his memory from many years ago and that, if she were to testify to that fact, he might be mistaken.

Trial counsel denied telling the petitioner what to say during the *Momon* hearing. He stated that he advised the petitioner of the purpose of the hearing and the questions that would be asked but not what answers to provide.

Susana Hernandez, the petitioner's cousin, testified that, after the petitioner was arrested for the victim's murder, "they were basically trying to, like, put out there that [the victim] was not a gang member." Ms. Hernandez stated that she knew the victim was a member of a gang, so she tried to find proof. Ms. Hernandez found the victim's Facebook page through his girlfriend, Ms. Tostado. Ms. Hernandez testified that the victim's

Facebook profile, which was under the name Chulito Pelones, contained "photographs and . . . conversations where, you know, he was admitting to criminal activity to being an active member of the Pelones gang." Ms. Hernandez printed the photograph of the victim on August 22, 2011, and provided it to the petitioner's initial attorney in General Sessions Court. When trial counsel was appointed to represent the petitioner, Ms. Hernandez left him a voicemail, asking him to contact her regarding the evidence that she found online; however, trial counsel never called her. Ms. Hernandez denied giving the photograph to the victim's mother but testified that they looked at the victim's Facebook page together. On cross-examination, Ms. Hernandez admitted that she never met the victim and had only seen him in pictures on Facebook. She did not know when or where the photograph in question was taken but stated that it looked like it was taken in a field. She testified that she did not recognize any of the other individuals in the photograph. She agreed she was not present when the photograph was taken, did not know who took the photograph, and was unsure who uploaded it onto Facebook.

Raquel Gonzalez, the petitioner's mother, testified through an interpreter that she saw the photograph of the victim on Facebook less than a month after the shooting. She stated that Ms. Hernandez gave her the photograph, which she downloaded from "Chulito Pelones's" Facebook page. Ms. Gonzalez then gave the photograph to the petitioner's first attorney. Ms. Gonzalez testified that she met with trial counsel once in 2012 to give him documents, including the photograph, but she did not tell trial counsel where she got the photograph. She later testified that she told trial counsel that she received all the documents from Ms. Hernandez and gave him her phone number. Trial counsel told Ms. Gonzalez that he would contact Ms. Hernandez. On cross-examination, Ms. Gonzalez admitted she did not know the victim before the shooting, had never seen the victim before, did not know anyone else in the photograph, did not know where the photograph was taken, and did not know who took the photograph or uploaded it onto Facebook. On redirect examination, Ms. Gonzalez testified that she gave trial counsel the photograph three weeks before trial. She agreed that she testified earlier that she gave trial counsel the photograph in 2012, but she stated that it had "been so long ago, so everything related to dates I don't have a good recollection of that."

After its review of the evidence presented, the post-conviction court denied relief, and this timely appeal followed.

## *Analysis*

On appeal, the petitioner argues trial counsel was ineffective for failing to adequately investigate the petitioner's case; adopting the strategy that the petitioner was not the shooter; advising the petitioner not to testify at trial; failing to adequately explain the advantages of testifying to the petitioner; failing to call Ms. Hernandez as a witness to

authenticate the photograph of the victim; failing to argue that the photograph should have been admitted into evidence; failing to have the photograph marked for identification; failing to object to the State's improper closing argument; and failing to allege in the motion for new trial that the trial court erred by failing to instruct the jury on the defense of others. The petitioner also argues appellate counsel was ineffective for failing to ensure the appellate record contained the amended motion for new trial and the photograph of the victim, the post-conviction court erred in denying the petitioner's request for funding, and the cumulative effect of trial counsel's errors warrants post-conviction relief. The State contends the post-conviction court properly denied post-conviction relief and the petitioner's request for funding.

## I.    Ineffective Assistance of Counsel[4]

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo,* with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations *de novo,* affording a presumption of correctness only to the post-conviction court's findings of fact. *Id*.; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's

---

[4] For the sake of clarity, we have reordered and renumbered the issues from the order they appeared in the petitioner's brief.

errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id.* Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.*; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

## A.    Trial Counsel

### i.    Failure to Investigate

The petitioner argues trial counsel was ineffective for failing to adequately investigate his case. Specifically, the petitioner contends trial counsel failed to locate witnesses who could corroborate a self-defense strategy. The State contends the post-conviction court properly found that trial counsel was not ineffective for failing to investigate.

At the evidentiary hearing, trial counsel testified that his investigator attempted to locate witnesses who could be helpful to the defense. However, the investigator was unable to find anyone willing to provide a statement because "they didn't want to help us or get involved." The petitioner agreed that trial counsel attempted to locate witnesses for the defense and provided the petitioner with a copy of the investigator's file. Although the petitioner argues trial counsel should have located and interviewed potential witnesses prior to trial, he failed to present any witnesses at the evidentiary hearing or state what information further investigation would have revealed or how it would have altered the

- 13 -

outcome of the trial and, therefore, cannot establish prejudice. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The petitioner acknowledges his failure to produce witnesses at the evidentiary hearing but submits that the post-conviction court erred in failing to grant him funds for an investigator. As discussed *infra*, an indigent petitioner is not entitled to state funds for an investigator in a petition for post-conviction relief. *See* Tenn. Sup. Ct. R. 13 § 5(a)(2). The petitioner is not entitled to relief on this issue.

### ii.     Ineffective Defense Strategy

The petitioner argues trial counsel was ineffective for adopting the trial strategy that the petitioner was not the shooter. Because numerous witnesses listed in the discovery, including the petitioner, stated that the petitioner shot a gun, the petitioner contends trial counsel should have adopted a self-defense theory at trial. The State contends the post-conviction court properly found that trial counsel was not ineffective for adopting the strategy that the petitioner was not the shooter.

Trial counsel testified that, because the petitioner alleged there was another shooter, he asked his investigator to locate witnesses to corroborate the petitioner's story. However, trial counsel was unable to obtain any proof to support a self-defense theory, so he decided to argue that the petitioner was not the shooter by questioning the witnesses' memories and arguing that the chaotic scene caused them to falsely accuse the petitioner. Trial counsel believed this was the "best strategy" given the evidence. The petitioner testified that he attempted to tell trial counsel what happened on the night of the shooting, but trial counsel would not let the petitioner explain why he shot the gun or how he felt at the time of the shooting. The petitioner believed trial counsel did not want the petitioner to incriminate himself.

As noted above, trial counsel did not adopt a self-defense theory at trial because he was unable to find any proof beyond the petitioner's testimony to corroborate such a theory. The post-conviction court implicitly accredited trial counsel's testimony, and nothing in the record preponderates against its findings. *See Tidwell*, 922 S.W.2d at 500. Under the circumstances, trial counsel developed a reasonable, albeit unsuccessful trial strategy, based upon adequate preparation, and this Court will not second-guess trial counsel's decision. The petitioner has failed to prove that trial counsel's performance was deficient, and he is not entitled to relief on this issue.

### iii.    Right to Testify

The petitioner argues trial counsel was ineffective for advising the petitioner not to testify and for failing to advise the petitioner of the advantages of testifying. The petitioner

specifically argues "[the petitioner's] testimony alone could have convinced the jury that he acted in self-defense, and "the record supports a finding that trial counsel, before hearing the jail calls, did not tell [the petitioner] about any pros of testifying." The State contends the post-conviction court properly found that trial counsel was not ineffective for failing to advise the petitioner of his right to testify.

Trial counsel testified that he and the petitioner had "a few meetings" where they discussed the pros and cons of testifying, and trial counsel stated that "whenever possible [he] like[d his] client to testify." However, trial counsel was worried about the petitioner testifying because there was nothing to corroborate the petitioner's claim that there was another gun at the scene and because the petitioner provided inconsistent statements during his jail phone calls with his mother. Trial counsel was not concerned about the petitioner's prior record because he did not have any impeachable convictions. Because of trial counsel's reservations, he advised the petitioner not to testify. Trial counsel could not recall whether he told the petitioner that he needed to testify to receive a self-defense instruction, that he might be convicted of a lesser-included offense if he testified, that he could inform the jury of the victim's gang affiliation, or that he could tell the jury why he initially told his mother that he was not involved in the shooting. However, trial counsel did inform the petitioner that his testimony could provide the jury with a more balanced view of the case and that he had no impeachable convictions. Trial counsel also denied telling the petitioner what to say during the *Momon* hearing.

The petitioner testified that, while trial counsel advised him of his right to testify, he did not explain the advantages and disadvantages of testifying. However, trial counsel told the petitioner that, if he chose to testify, the State would bring up his prior record. Before trial, trial counsel played the petitioner's jail calls and told the petitioner that they "blow [their] defense out of the water" because the petitioner admitted to the shooting. Trial counsel was also worried because the petitioner initially told his mother that he did not participate in the shooting. The petitioner testified that he told her this because he did not want her to worry. After showing the petitioner the jail calls, trial counsel was "very adamant" that the petitioner not testify, and when the petitioner indicated a desire to testify during the trial, trial counsel told him that he would be "going out there on [his] own." Although the petitioner stated that he decided to trust trial counsel's advice regarding whether to testify, he stated that trial counsel "coerced" him into providing certain answers during the *Momon* hearing. If he had testified at trial, the petitioner would have told the jury that he fired his gun after hearing a gunshot and seeing a muzzle flash. The petitioner testified that "fear gripped [his] body" during the shooting, and he could not remember where he aimed or in which direction he fired the gun. During cross-examination, the petitioner stated that he was "not sure if [his testimony] would've went in line with self-defense or a crime of passion or in the spur of the moment." He also agreed that he was in

his vehicle when the fight broke out and could have left the scene without involving himself.

As noted above, implicit in the post-conviction court's order denying relief is an accreditation of trial counsel's testimony, and nothing in the record preponderates against the post-conviction court's factual findings. *See Tidwell*, 922 S.W.2d at 500. Trial counsel and the petitioner discussed the petitioner's right to testify, and trial counsel advised the petitioner that, because of his problematic jail phone calls and the lack of corroboration for his self-defense story, he should not testify. We conclude that trial counsel's advice to the petitioner not to testify when he was concerned with the lack of corroboration of the petitioner's testimony and the likely stringent cross-examination of the petitioner regarding his inconsistent jail phone calls was reasonable under prevailing professional norms. Although the petitioner presented his potential trial testimony at the evidentiary hearing, the post-conviction court found "his version of events failed to clearly convince this court that [the petitioner] would have well withstood the crucible of testifying before a jury."

Furthermore, during the trial, the trial court held a *Momon* hearing in which the petitioner testified he understood that he had a right to testify and that the decision of whether to testify was his to make. Trial counsel asked the petitioner whether they had "talked about the pros and cons of [testifying and not testifying]," and the petitioner answered, "That's right." It is well-settled that a petitioner's "[s]olemn declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). Accordingly, the petitioner has failed to show that he is entitled to post-conviction relief.

### iv. Failure to Argue for Admittance of Photograph and Call Ms. Hernandez During Hearing

The petitioner argues trial counsel was ineffective for failing to argue more strenuously that the photograph of the victim should be admitted as well as for failing to call Ms. Hernandez as a witness at the jury-out hearing to authenticate the photograph. The petitioner argues trial counsel should have argued that the photograph was relevant to show why the petitioner was in fear of the victim and his associates and that Ms. Hernandez would have testified at the hearing that she downloaded the photograph from Facebook. The State contends the post-conviction court properly found that trial counsel was not ineffective for failing to argue more strenuously for the photograph's admission or for failing to call Ms. Hernandez at the jury-out hearing.

According to trial counsel, he received the photograph of the victim from the petitioner's mother, who told trial counsel that she retrieved it from someone's Facebook page, "either during trial or right before." Trial counsel attempted to introduce the

photograph "[t]o show that the victim was in a gang and that there was more to this than meets the eye." During the jury-out hearing, the victim's brothers and friend identified the victim in the photograph but denied he was a member of the Pelones gang and could not identify anyone else in the photograph or confirm any of its details. Trial counsel did not call the person who downloaded the photograph from Facebook to testify at the hearing because he did not know who that person was. Trial counsel agreed that he told the trial court at the end of the hearing that he "assume[d] . . . [the court was] not going to let [him] introduce this photograph" because "it was clear the [trial court] wasn't going to let it in." Trial counsel testified that he did not argue that the photograph should be admitted to show the petitioner's state of mind but stated that "by implication that's . . . why [he] was trying to put it in." Trial counsel testified that he did not recall the petitioner's mother mentioning the name Susana Hernandez or Ms. Hernandez contacting his office.

On cross-examination, trial counsel agreed that he did not have sufficient time to investigate the source of the photograph. If provided the photograph earlier, trial counsel would have given it to his investigator, but he was unsure if that would have been helpful. However, even if trial counsel knew who downloaded the photograph from Facebook, he did not believe the trial court would have admitted it because "the person who took it down from Facebook can't say anything about the photograph," and it was clear to trial counsel that the court's issue was with "the picture itself and the authentication of the picture itself, not where it came from or how or the fact that it came from Facebook." Trial counsel testified that the State never argued that the photograph did not come from Facebook, so that was not an issue at the hearing.

Susana Hernandez testified that she searched for the victim's Facebook page to find proof that he was in a gang after her cousin, the petitioner, was arrested. Ms. Hernandez found a Facebook profile named "Chulito Pelones," which contained "photographs and . . . conversations where . . . [the victim] was admitting to criminal activity to being an active member of the Pelones gang." Ms. Hernandez printed the photograph of the victim and provided it to the petitioner's first attorney. She also showed the petitioner's mother the Facebook profile. When trial counsel was appointed to represent the petitioner, Ms. Hernandez left him a voicemail with her contact information. However, trial counsel never called her back. On cross-examination, Ms. Hernandez admitted that she did not know the victim and had only seen him in pictures on Facebook. She did not know where or when the photograph was taken, who took the photograph, any of the other individuals in the photograph, or who uploaded it onto Facebook. The petitioner's mother testified that Ms. Hernandez gave her a copy of the photograph, which she provided to trial counsel along with Ms. Hernandez's name and phone number. Trial counsel told her that he would contact Ms. Hernandez. The petitioner's mother could not recall the exact date that she gave trial counsel the photograph because it was "so long ago."

In ruling on this issue, the post-conviction court specifically discredited the petitioner's mother's testimony regarding when she provided trial counsel the photograph, finding the petitioner's mother was "not credible." The post-conviction court implicitly accredited trial counsel's testimony. "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact," and the post-conviction court's credibility determinations are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). The post-conviction court found that

> [t]rial counsel's actions during the trial do have a duality to them. Trial counsel made the decision to proceed only on the theory of identity, but he still sought to introduce the picture of the victim. . . . Any indication that trial counsel's maneuvers seemed of two minds probably represented the conflict with his client about the direction of the theory of the case. In asking to admit the photograph, in spite of his chosen theory of the case, trial counsel made a request to enter the picture. The trial court ruled the picture was inadmissible. This picture was never relevant to the question of [the petitioner's] credibility.
>
> . . . .
>
> [The petitioner] could not provide credible proof when trial counsel came to know of [the photograph's] existence . . . a material issue when determining whether trial counsel acted reasonably in relation to the evidence in the months and weeks before trial. . . . Susana Hernandez, [the petitioner's] cousin, testified that she downloaded the picture from someone else's Facebook page and gave it to [the petitioner's] first attorney. She testified that she did not know the victim personally. She testified that she did not know anything about the picture. She testified that it looked like it had been taken in a field. . . . This court finds that trial counsel was not deficient for failing to introduce [the photograph], including calling a witness to authenticate the photograph. Trial counsel at the time could not authenticate the picture.

The record does not preponderate against the findings of the post-conviction court, and the petitioner is not entitled to relief on this issue.

### iv.     Failure to Introduce Photograph for Identification

The petitioner argues trial counsel was ineffective for failing to mark the photograph of the victim for identification during the jury-out hearing. The petitioner submits that this

failure prevented this Court from reviewing it on direct appeal. The State concedes trial counsel's failure to mark the photograph for identification was deficient but contends the petitioner was not prejudiced by the deficiency.

During the evidentiary hearing, trial counsel admitted it "was a mistake on [his] part" to not introduce the photograph of the victim for identification. "[He] planned on doing it . . . when [they] had that out-of-court hearing[, but he] must have just forgotten in the . . . heat of trial." Our law is clear that the appealing party bears the burden of ensuring that a fair, accurate, and complete record is before this Court for review. *See State v. Myers*, 581 S.W.3d 173, 185 (Tenn. 2019). Accordingly, we conclude that trial counsel was deficient in failing to have the photograph marked for identification.

To be entitled to post-conviction relief, the petitioner, however, must also prove that he was prejudiced by this error. The post-conviction court found that the petitioner could not prove that the outcome of his direct appeal would have been different if the issue of evidentiary exclusion had been properly preserved. The record supports the findings and conclusions of the post-conviction court. The post-conviction court noted that

> [b]ased upon trial counsel's choice not to pursue a theory of self-defense, the trial court's decision to exclude the picture was also properly grounded in the law and sound evidentiary principles even if the trial court misstated the burden of proof in one instance, the trial court enunciated the appropriate standard elsewhere and the ruling kept within both the letter and spirit of the evidentiary rule of law. In the context of trial counsel's strategic decision to pursue an identity defense, which this trial court does not second guess, the picture of the victim with the 'Pelones' gang members became an impermissible attack on character only and now relevant.
>
> Had [trial and] appellate counsel appropriately complied the record, no reasonable probability exists that the Tennessee Court of Appeals would have reversed. Without self-defense reasonably being supported by the proof, the appellate court most certainly would have affirmed [the petitioner's] conviction. Given that [the petitioner] contested the identity of the shooter without raising the issue of self-defense at trial, the appellate court would have affirmed the trial court's exclusion of proof about the victim's gang involvement as not relevant, probative of nothing and serving only to besmirch the deceased. Based upon the defense's chosen theory, the trial court was right to exclude the picture.

Based upon the findings of the post-conviction court and our review of the record, we conclude that the petitioner has not met his burden of proof to establish that he is entitled

to post-conviction relief. The petitioner has failed to demonstrate prejudice to himself, and the evidence does not preponderate against the findings of the post-conviction court. Thus, the petitioner is not entitled to relief on this issue.

### v.      Failure to Object to Closing Argument

The petitioner argues trial counsel was ineffective for failing to object to the prosecutor's statements during rebuttal closing argument. The petitioner argues the statements were meant "to rile the jury up" and "to inflame the passions or prejudices of the jury." The States contends the argument was not improper, but even if the statements constituted improper argument, the petitioner failed to demonstrate that he was prejudiced.

"Closing arguments serve to sharpen and to clarify the issues that must be resolved in a criminal case" and enable "the opposing lawyers to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury." *State v. Hawkins*, 519 S.W.3d 1, 47 (Tenn. 2017) (citations and quotations omitted). Because counsel in criminal cases are "'expected to be zealous advocates,'" they are afforded "'great latitude in both the style and the substance of their arguments.'" *Id.* (quoting *State v. Banks*, 271 S.W.3d 90, 130-31 (Tenn. 2008)). Prosecutors, however, "must not lose sight of their duty to seek justice impartially and their obligation 'to see to it that the defendant receives a fair trial.'" *Id.* at 47-48 (quoting *Banks*, 271 S.W.3d at 131). Accordingly, a "prosecutor's closing argument must be temperate, must be based on the evidence introduced at trial, and must be pertinent to the issues in the case." *Banks*, 271 S.W.3d at 131 (citations omitted). "[P]rosecutors, no less than defense counsel, may use colorful and forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence, or make derogatory remarks or appeal to the jurors' prejudices." *Id.* (citations omitted).

There are five generally recognized areas of prosecutorial misconduct that can occur during closing arguments: (1) "[i]t is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw"; (2) "[i]t is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant"; (3) "[t]he prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury"; (4) "[t]he prosecutor should refrain from argument which would divert the jury from its duty to decide the case on evidence, by injecting issues broader than guilt or innocence of the accused under the controlling law"; and (5) "[i]t is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge." *State v. Goltz*, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003) (internal citations omitted).

During rebuttal closing argument, the prosecutor made the following statements:

Too often in murder cases somebody is forgotten because they're not here. The case becomes about the defendant. But there is somebody else involved in this case. Somebody who is not here. Somebody you couldn't hear from. That person's name is Miguel Villa.

We say that because he was a real person. His real brother is sitting right out there. You're seeing his people here. He was a real person. He existed, ladies and gentlemen. He's not just a name in a case, in a courtroom in Shelby County, Tennessee. He was a real person and more than that he was a human life. A human life that went about his affairs in Memphis, Shelby County, Tennessee.

Life must matter. Not only on a global scale life must matte[r]; not only in Shelby County, Tennessee; not only at 201 Poplar, but right here in Criminal Court division 10, right now, life must matter. Because [the defendant] took that gun and he did that to a real person, to a real person that lived here in Shelby County, Tennessee.

. . . .

He died a meaningless death. He died a senseless death because of [the defendant]. Because [the defendant] opened fire on a group of people in a parking lot. Because [the defendant] decided – that night he got to decide who would be alive and who would be dead and [the defendant] that night was a dealer of death so somebody could lay in the parking lot of a donut store and die.

During the evidentiary hearing, trial counsel agreed that it was "clearly an error on [his] part" not to object to the prosecutor's comment regarding the victim being a "real person" who lived in Shelby County. Trial counsel stated that he also should have objected when the prosecutor called the petitioner a "dealer of death." However, he did not find it "nearly as objectionable." Even if trial counsel was deficient for failing to object to the statements, the petitioner has failed to demonstrate that he was prejudiced by trial counsel's failure to object.

At trial, the State produced compelling evidence against the petitioner. Jesus Villa, Richard Ortega, and Jose Villa testified that they saw the petitioner, the only person with a firearm, shoot toward their group. The victim received one fatal gunshot wound to his back. When police arrived at the petitioner's hotel room the next morning, he admitted to

being at the scene of the shooting, and a firearm recovered from the hotel room matched the only shell casings recovered from the scene. Additionally, to the extent the prosecutor's statements may have provoked prejudice or sympathy, the trial court instructed the jury to have no "sympathy or prejudice or allow anything but the law and the evidence to have any influence upon them in determining their verdict." The trial court also instructed the jury that "[s]tatements, arguments and remarks of counsel are intended to help you in understanding the evidence and applying the law. They are not evidence. If any statements were made that you believe were not supported by the evidence, you should disregard them." This Court presumes the jury followed the trial court's instructions. *State v. Starner*, No. M2014-01690-CCA-R3-CD, 2016 WL 1620778, at *21 (Tenn. Crim. App. Apr. 20, 2016) (citing *State v. Young*, 196 S.W.3d 85, 111 (Tenn. 2006); *State v. Shaw*, 37 S.W.3d 900, 904 (Tenn. 2001)). The petitioner has failed to demonstrate that but for trial counsel's failure to object, the outcome of his trial would have been different. Therefore, the petitioner is not entitled to relief on this issue.

### vi.     Failure to Include Issue in Motion for New Trial

The petitioner argues trial counsel was ineffective for failing to allege in the motion for new trial that the trial court erred by failing to instruct the jury on the defense of others. The petitioner submits "there [was] a chance that the trial court would have seen the error in its ruling and would have granted a new trial," or if not, "there [was] a reasonable probability that this Court would have concluded that the trial court erred." The State contends the post-conviction court properly found that trial counsel was not ineffective for failing to include the defense of others issue in the motion for new trial.

Trial counsel testified that he requested an instruction on the defense of others, which was denied because the trial court did not feel the proof rose to the level of the defense of others. Trial counsel could not recall why he did not include that issue in the motion for new trial and agreed "it was a mistake on [his] part." The post-conviction court determined that the petitioner failed to show that he was prejudiced by the omission of the issue, and we agree. The petitioner argues that Mr. Ortega's use of pepper spray on the night of the shooting could have been perceived as a deadly weapon but fails to show how or why he would have prevailed on appeal had this issue been included in the motion for new trial. The petitioner failed to prove prejudice on this claim. The post-conviction court extensively analyzed this issue, concluding that even if trial counsel had included the issue in a motion for new trial, the petitioner would not have been successful on appeal. The petitioner has presented no authority in this Court to show otherwise. Accordingly, the petitioner is not entitled to relief on this issue.

**B.      Appellate Counsel**

The petitioner argues appellate counsel was ineffective for failing to include a copy of the amended motion for new trial and the photograph of the victim in the record on appeal.  The petitioner contends appellate counsel's failure to ensure a complete record on appeal prevented this Court from reviewing his "winning appellate argument that the trial court abused its discretion in not allowing the jury to see this photograph."  The State submits that the petitioner was not prejudiced by appellate counsel's failure to ensure the amended motion for new trial was in the appellate record and that appellate counsel could not have supplemented the record with the photograph of the victim.

**i.      Amended Motion for New Trial**

We agree with the petitioner that appellate counsel's failure to include the amended motion for new trial in the record on appeal constituted deficient performance.  *See Beamon v. State*, No. E2008-01138-CCA-R3-PC, 2009 WL 2922841, at *12 (Tenn. Crim. App. Sept. 14, 2009); *see also* Tenn. R. App. P. 24(b) (providing that it is the appellant's duty to prepare a record which conveys a "fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal").  As to prejudice, the petitioner claims that because this Court waived the petitioner's issue due to the lack of the amended motion for new trial, this Court was unable to consider whether the trial court erred in excluding the photograph of the victim.

The petitioner contended on direct appeal "that the trial court should have allowed into evidence a photograph of the murder victim that had been overlaid with the word 'Pelones.'"  As discussed *supra*, the post-conviction court found that "no reasonable probability exists that [this Court] would have reversed" the trial court, and the evidence does not preponderate against those findings.  Therefore, the petitioner cannot prove prejudice and is not entitled to relief on this issue.

**ii.      Photograph**

The petitioner argues appellate counsel was deficient for failing to supplement the appellate record with the photograph of the victim, and the post-conviction court agreed this constituted deficient performance.  We disagree.  As our supreme court has recognized,

> In order for an appellate court to review a record of excluded evidence, it is fundamental that such evidence be placed in the record in some manner. When it is a document or exhibit, this is done simply by having the exhibit marked for identification only and not otherwise introduced.  When, however, it consists of oral testimony, it is essential that a proper offer of

- 23 -

proof be made in order that the appellate court can determine whether or not exclusion was reversible.

*State v. Goad*, 707 S.W.2d 846, 852-53 (Tenn. 1986). We encourage practitioners to be mindful that "[w]hat is in the record sets the boundaries for what the appellate courts may review, and thus only evidence contained therein can be considered." *State v. Bobadilla*, 181 S.W.3d 641, 643 (Tenn. 2005); *see also State v. Hamilton*, No. W2023-01127-CCA-R3-CD, 2024 WL 4130757, at \*3 (Tenn. Crim. App. Sept. 10, 2024) ("Stated more simply, if a fact is not in the appellate record, it did not happen."), *perm. app. denied* (Tenn. Feb. 20, 2025). Because trial counsel did not mark the photograph for identification, appellate counsel was not deficient for failing to include it in the appellate record. Accordingly, the petitioner is not entitled to relief on this issue.

## II. Denial of Expert Funding

The petitioner argues the post-conviction court erred in denying his motion "for funding for an investigator." Although the petitioner acknowledges that our supreme court's rules do not mandate funding in non-capital cases, he contends the rules "violate[] his federal and state constitutional rights to due process." The State argues the petitioner was not entitled to funding for an investigator.

An indigent petitioner is not entitled to state funds for an investigator in a petition for post-conviction relief. According to our Tennessee Supreme Court Rules,

> [i]n the *trial and direct appeal* of all criminal cases in which the defendant is entitled to appointed counsel and in the trial and appeals of post-conviction proceedings in capital cases involving indigent petitioners, the court, in an *ex parte* hearing, may in its discretion determine that investigative or expert services or other similar services are necessary to ensure that the constitutional rights of the defendant are properly protected.

Tenn. Sup. Ct. R. 13 § 5(a)(1) (emphasis added). "In non-capital post-conviction proceedings, funding for investigative, expert, or similar services shall not be authorized or approved." Tenn. Sup. Ct. R. 13 § 5(a)(2). Moreover, in *Davis v. State*, 912 S.W.2d 689 (Tenn. 1995), our supreme court explained that "[a] person's right to counsel ends at the conclusion of the first stage of direct appeal" and that "[i]n the absence of a Constitutional right to counsel, there can be no Constitutional right to support services at state expense."

The petitioner contends "it is not fair to provide funding for expert witnesses to a defendant at the trial level but to deny funding to that same defendant when he is attempting

to prove prejudice at the post-conviction level," and therefore, Tennessee Supreme Court Rule 13 § 5(a)(2) "acts as a barrier to indigent petitioners who are trying earnestly to prove prejudice." However, this Court is bound by the decisions of the Tennessee Supreme Court. *Onyiego v. State*, No. W2022-00629-CCA-R3-PC, 2023 WL 2326336, at *24 (Tenn. Crim. App. Mar. 2, 2023), *no perm. app. filed*. Thus, we must conclude that the petitioner was not entitled to funds for an investigator and is not entitled to relief on this issue.

## III.    Cumulative Error

Finally, the petitioner contends the cumulative effect of the errors alleged above entitles him to post-conviction relief. "To warrant assessment under the cumulative error doctrine, there must have been more than one actual error committed in the trial proceedings." *State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010). Because the petitioner has not established any error, he is not entitled to relief under the cumulative error doctrine.

### *Conclusion*

Based upon the foregoing authorities and reasoning, we affirm the post-conviction court's judgment denying the petitioner post-conviction relief.

s/ *J. ROSS DYER*                          _
J. ROSS DYER, JUDGE

- 25 -